UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EMMALIE SEIJAS, et al.,

Plaintiff,

v.

THE JACKSON LABORATORY, et al.,

Defendants.

No. 2:24-cv-03423-DJC-AC

ORDER

Plaintiff Emmalie Seijas filed this case as a class action in California state court, and Defendants removed the case to this Court under the Class Action Fairness Act ("CAFA"). Pending before the Court is Plaintiff's Motion to Remand (ECF No. 21), which argues Defendants failed to establish the requisite amount in controversy for CAFA jurisdiction. For the reasons stated below, remand is denied.

**BACKGROUND**

Plaintiff Emmalie Seijas filed this case on behalf of herself and other employees similarly situated against Defendants in the Superior Court for the County of Sacramento. Plaintiff alleges failure to pay overtime and minimum wages, provide or compensate for missed meal and rest breaks, and reimburse business-related costs as well as waiting time penalties and wage statement violations. (FAC ¶¶ 68–148.) Based on these allegations, Plaintiff brings claims under the California Unfair

1

Competition Law (UCL), Cal. Bus. & Profs. Code §§ 17200, et seq.; Cal. Lab. Code §§ 510, 1198, 226.7, 512(a), 1194, 1197, 1197.1, 201, 202, 204, 226(a), 1174(d), 2800, and 2802.

Defendants timely removed this action under CAFA, codified at 28 U.S.C. § 1332(d).  (*See* Not. Removal (ECF No. 1).)  Plaintiff then moved to remand this action. (*See* Mot. (ECF No. 21)).  Briefing on Plaintiff's Motion to Remand is now complete. (Mot. (ECF No. 21); Opp'n (ECF No. 22); Reply (ECF No. 23).)  The Court heard argument on this Motion on October 16, 2025.  Dominic Scarangella appeared for Plaintiff, and Jeffrey Nordlander appeared for Defendant.  The Motion was taken under submission.  (*See* ECF No. 27.)

**DISCUSSION**

**I.  Legal Standard**

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district . . . where such action is pending."  28 U.S.C. § 1441(a).  Under CAFA, the federal courts have original jurisdiction over class actions in which the parties are minimally diverse, the proposed class has at least 100 members, and the aggregated amount in controversy exceeds $5 million.  *See* 28 U.S.C. § 1332(d)(2), (d)(5)(B).

A defendant removing a class action filed in state court pursuant to CAFA need only plausibly allege in the notice of removal that the CAFA prerequisites are satisfied. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  However, the plaintiff can then contest the amount in controversy by making either a "facial" or "factual" attack on the defendant's jurisdictional allegations.  *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020).  "A facial attack accepts the truth of the [defendant's] allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."  *Id.* (internal quotation marks omitted) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).  A factual attack, on the other hand, contests the

2

truth of the allegations themselves. *Id.* When a plaintiff mounts a factual attack, they "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." *Id.* at 700.

"When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold." *Id.* at 699. Specifically, when a plaintiff's complaint does not quantify damages, defendants must show that the amount in controversy exceeds the jurisdictional threshold by a preponderance of the evidence. *See Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 849 (9th Cir. 2020). A defendant "is only required to show that it is more likely than not that Plaintiff's maximum recovery reasonably could be over $5 million." *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1185 (E.D. Cal. 2020). This burden is not daunting as "a removing defendant is not obligated to research, state, and prove the plaintiff's claims for damages." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204–05 (E.D. Cal. 2008) (internal quotation marks omitted).

Rather, in making this showing, a removing defendant "must be able to rely 'on a chain of reasoning that includes assumptions.'" *Jauregui v. Roadrunner Transportation Servs., Inc.*, 28 F.4th 989, 993 (9th Cir. 2022) (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015)); *see also Jauregui*, 28 F.4th at 993 (explaining that a "CAFA defendant's amount in controversy assumptions in support of removal will always be just that: assumptions"). These assumptions must reflect more than "mere speculation and conjecture." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). Such assumptions require "some reasonable ground underlying them," *id.* at 1199, but they "need not be proven." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019). Assumptions may be reasonable if they are "founded on the allegations of the complaint." *Id.* at 925. Parties may also "submit evidence outside the complaint, including affidavits or declarations, or other

summary-judgment type evidence." *See Ibarra*, 775 F.3d at 1197 (internal quotation marks omitted).

"If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The Supreme Court has advised, however, "that no antiremoval presumption attends cases invoking CAFA" in part because the statute was enacted "to facilitate adjudication of certain class actions in federal court." *Dart Cherokee*, 574 U.S. at 89 (citations and quotations marks omitted). "CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Id.* (internal quotation marks omitted); *see also Ibarra*, 775 F.3d at 1197.

## II. Analysis

The Parties do not dispute that they are diverse or that the proposed class has at least 100 members. The only issue before the Court is whether the amount in controversy exceeds $5 million.

### A. Plaintiff Brings a Factual Challenge to Jurisdiction

Plaintiff contests the truth of Defendants' allegations in the Notice of Removal. Plaintiff asserts that Defendants' assumptions of the facts underlying Plaintiff's claims are unsupported by the language in the Complaint and unreasonable, absent supporting evidence. (*See, e.g.*, Mot. at 9 ("Defendants fail to even lay foundation that all of the shifts the class members worked were of sufficient length to mandate the provision of meal and rest periods"); *Id.* at 7 ("Defendants provide no reasonable explanation for assuming that each putative class member worked an hour of unpaid overtime every single week").) These assertions by Plaintiff constitute a factual challenge to Defendants' invocation of jurisdiction as each challenges the facts Defendants assume underpin Plaintiff's claims. *See Harris*, F.3d 980 at 701 (concluding plaintiff's "motion to remand raised a factual challenge" to defendant's assumptions that all class members "worked shifts long enough to be eligible for meal

4

and rest periods").  Therefore, as Plaintiff makes a factual attack, the burden is on Defendants to establish by "competent proof" and a preponderance of the evidence under the same standard as at summary judgment that the amount in controversy exceeds the $5 million jurisdictional threshold.[1]  *See id.* at 700–01 (quoting *Salter v. Quality Carriers*, 974 F.3d 959, 964 (9th Cir. 2020)).

### B.  Differences between Defendants' Notice of Removal and Opposition

As the FAC does not specify an amount in controversy, Defendants present their own amount-in-controversy calculations.  In their Notice of Removal, Defendants assert the total amount in controversy is $13,514,985.71, consisting of $2,196,014.45 in unpaid overtime, $2,928,019.65 in meal break violations, $2,928,019.65 in rest break violations, $1,545,285.60 in waiting time penalties, $1,214,650.00 for inaccurate wage statements, and $2,702,997.14 in attorneys' fees.  (*See* Not. ¶¶ 23, 27, 30, 35, 38, 42.)  In contrast, in their Opposition, Defendants assert the total amount in controversy is, at a minimum, $14,812,514.58, consisting of $1,786,138.68 in unpaid overtime, $2,003,627.16 for meal break violations, $5,247,103.42 for rest break violations, $1,814,342.40 for waiting time penalties, $998,800 for inaccurate wage statements, and $2,962,502.92 in attorneys' fees.  (*See* Opp. at 18.)  Defendants attribute these disparities to the use of a more precise workweek figure in all calculations.  (*Id.* at 4 n.3.)  The workweek figure in the Notice of Removal, Defendants explain, represents "employees' dates of employment reflected in JAX's census records."  (*Id.*)  In contrast, in their Opposition, Defendants rely on their timekeeping and payroll records to ensure the workweek figure included only weeks employees actually worked.  (*Id.*)

---

[1] Although Defendants suggest Plaintiff must present evidence to rebut Defendants' calculations (Opp'n at 5, 11), the Ninth Circuit has made clear that while both sides must have an opportunity to submit evidence, it is the defendant's burden to show by a preponderance of the evidence that the amount in controversy is met.  *Moe v. GEICO Indem. Co.*, 73 F.4th 757, 762 (9th Cir. 2023); *see also Harris* 980 F.3d at 700 (explaining that, in a factual attack, the attacking party need only make a "reasoned argument" explaining why the asserting party's assumptions are unsupported by evidence).

Courts can construe both a defendant's opposition and evidence provided after the notice of removal as amendments to the original notice of removal. *See Gen. Dentistry For Kids, LLC v. Kool Smiles, P.C.*, 379 F. App'x 634, 636 (9th Cir. 2010) (explaining that Ninth Circuit precedent "holds that a district court may consider later-provided evidence as amending a defendant's notice of removal"); *Pro 49 Dev., LLC v. Ness Express 1, LLC*, No. 2:24-cv-01850-JAM-JDP, 2024 WL 4542306, at *1 (E.D. Cal. Oct. 22, 2024) (explaining that "district courts have routinely considered filings other than the notice of removal when determining whether [they have] jurisdiction"). Further, as Defendants have explained the basis for the differences in their calculations, this Court does not have reason to question their validity. *Cf. Amirian v. Umpqua Bank*, No. 2:17-cv-07574-FMO-FFM, 2018 WL 3655666, at *3 (C.D. Cal. July 31, 2018) (explaining that "Defendant's failure to explain the basis for its shifting estimates causes the court to question the basis, validity, and accuracy" of Defendant's calculations).

Therefore, the Court construes Defendants' Opposition as an amendment to its Notice of Removal and will respond to calculations therein, as well as to calculations in the Notice of Removal where applicable.

**C. Amount in Controversy**

In opposing the Motion to Remand, Defendants offer a declaration from Martha Munhall, Vice President of Human Resources for Defendant Jackson Laboratory. (Munhall Decl. (ECF No. 22-3).) The Declaration attests to her personal knowledge of the company's employment, timekeeping, and payroll policies and practices. (*Id.* ¶ 3.) This Declaration relies on the Jackson Laboratory's business records, including census, timekeeping, and payroll records. Based on these records, Munhall identifies, during the relevant period: (a) the number of total, full-time, and part-time employees in California; (b) the number of pay periods; (c) the average hourly rate for non-exempt California employees; (d) the average shift length; (e) the number of employees who separated their employment; (f) and the number of wage statements

issued.  (*Id*. ¶¶ 5-9.)  Based on the data reviewed by Munhall, Defendants calculated the amount in controversy as follows:

- Overtime violations: Defendants assumed one hour of uncompensated overtime per putative class member per workweek.  (Opp'n at 12.)  Defendants multiplied this number by the overtime rate of $36.345 (average hourly rate of pay of putative class members of $24.23 x 1.5[2]) by 49,144 (the number of weeks worked by class members during the relevant period) to equal **$1,786,138.68**.  (*Id*. at 13.)

- Rest break violations: Defendants assumed a 100% violation rate, meaning that putative class members missed and were not paid premiums for all rest breaks they were entitled to.  (*Id*. at 9.)  Defendants multiplied this violation rate by $24.23 (the average hourly rate of pay of putative class members)[3] and by 216,554 (the number of rest period-eligible shifts).  (*Id*. at 10.)  In total, Defendants calculate the value of this claim to be **$5,247,103.42**.  (*Id*.)

- Meal break violations: Defendants assumed 2 meal break violations per workweek, a violation rate of 40%.  (*Id*. at 11.)  Defendants multiplied this violation rate by $24.23 (the average hourly rate of pay of putative class members)[4]  and by 206,730 (the number of meal period-eligible shifts).  (*Id*. at 12.)  In total, Defendants calculate the value of this claim to be **$2,003,627.16**.  (*Id*.)

- Waiting time penalties: Defendants assumed a violation rate of 100% for the waiting time penalties.  (*Id*. at 14.)  Defendants determined that 312

---

[2] Each non-exempt employee is entitled 1.5 times their regular rate of pay for time worked in excess of 8 hours per workday or 40 hours per workweek.  Lab. Code § 510(a).

[3] An employee who does not receive a meal or rest period is entitled to one hour of pay at their regular rate of compensation as premium pay.  *See* Lab. Code § 226.7(c).

[4] *See* n.3 *supra*.

full-time employees terminated their employment with Defendants during the relevant time period and multiplied this number by $24.23 (the average hourly rate of pay of putative class members), 8 hours (presumably the average shift length, though Defendants do not explain this figure), and 30 days (the statutory maximum). (*Id.* at 15.) In total, Defendants calculate the value of this claim to be **$1,814,342.40**. (*Id.*)

- Wage statement violations: Defendants assumed a violation rate of 100%. (*Id.* at 15.) Using this violation rate, Defendants then added $23,700 (the estimated damages for initial non-compliant wage statements) to $975,100 (the estimated damages for subsequent non-compliant wage statements) to reach a total of **$998,800**.[5] (*Id.* at 16.)

- Attorneys' fees: Defendants assumed attorneys' fees would constitute 25% of the damages calculated above. (*Id.* at 17.) Defendants multiplied this percentage by $11,850,011.66 (the total of the above damages), resulting in **$2,962,502.92** in attorneys' fees. (*Id.* at 18.)

In total Defendants estimate an amount in controversy of $14,812,514.58. (*Id.* at 18.) This calculation does not include Plaintiff's claims for unpaid minimum wages and unreimbursed business expenses. (Opp'n at 17.) Plaintiff argues the assumed violation rates used in these calculations are unreasonable and unsupported.

### 1. Overtime

Defendants' overtime calculation is reasonable and supported. Defendants estimate one hour of unpaid overtime per week for each class member based on Plaintiff's allegation that putative class members "were not receiving accurate overtime compensation for all overtime hours worked." (Opp'n at 12; FAC ¶ 37.) Plaintiff alleges "Defendants engaged in a pattern and practice of wage abuse" in

---

[5] California law permits employees to seek penalties of $50 for the initial non-compliant wage statement and $100 for each violation in a subsequent pay period. Lab. Code. § 226(e)(1). The total aggregate penalty cannot exceed $4,000 per employee. *Id.*

which she and other putative class members were "regularly" required to perform work duties "off-the-clock" in excess of such hours "in order to meet productivity quotas set by Defendants and avoid accruing unauthorized overtime." (FAC ¶ 73.) However, Plaintiff argues that a "100% violation rate" is "illogical" when "the employer provided no evidence supporting those rates." (Reply at 10.)

While Plaintiff is correct that descriptors in a complaint such as "pattern and practice" or "regularly" do not usually, on their own, support an inference of a 100% violation rate, *see Ibarra*, 775 F.3d at 1199, Defendants do not assert a 100% violation rate and supply evidence supporting their assumed violation rate. First, a 100% violation rate would translate to the assumption that each putative class member did not receive overtime pay for overtime worked in each shift. *See Ibarra*, 775 F.3d at 1199 n.3 (9th Cir. 2015) (describing defendant's "100% violation rate calculation, i.e., assuming that violations occurred in every identified shift for each class member"); *Nolan v. Kayo Oil Co.*, No. 3:11-cv-00707-MEJ, 2011 WL 2650973, at *4 (N.D. Cal. July 6, 2011) (explaining that defendant "did not assume a 100% violation rate" by assuming "only one hour of unpaid overtime per employee per week"). Defendants do not assume each class member worked uncompensated overtime with each shift but instead assume each class member worked one hour of unpaid overtime per week. (Opp'n at 12.)

Second, Defendants have supplied evidence in support of their assumed violation rate and properly derive this assumption from the language of the operative complaint. According to the Munhall Declaration, the average shift length during the relevant period spanned 8.06 hours. (Munhall Decl. ¶ 7.) California law entitles employees to 1.5 times pay for all hours worked in excess of 8 hours in a day or 40 hours in a week and 2 times pay for all hours worked in excess of 12 hours in a day. Lab. Code § 510. Both Defendants' evidence that the average shift length exceeded eight hours and the FAC's allegation that putative class members were "regularly" required to perform "work duties off-the-clock" indicate putative class members

consistently worked overtime.  (*See* FAC ¶ 73.)  These facts combined with Plaintiff's allegation that Defendants engaged in a "pattern and practice of wage abuse" that included failure to pay "overtime wages" (*id.* ¶ 63), render Defendants' assumption of one hour of uncompensated overtime per workweek reasonable.  *Gant v. ALDI, Inc.*, No. 2:19-cv-031090-JAK-PLA, 2020 WL 1329909, at *6 (C.D. Cal. Mar. 20, 2020) (holding that because "the Complaint alleges that Defendants engaged in a pattern and practice of overtime violations, it is reasonable for Defendants to assume that each employee in the putative class worked one hour of uncompensated overtime each week"); *Wheatley v. MasterBrand Cabinets*, LLC, No. 5:18-cv-02127-JGB-SP, 2019 WL 688209, at *5 (C.D. Cal. Feb. 19, 2019) (holding "an estimate of one hour per class member per week to be appropriate in light of Plaintiff's allegation that Defendant had a 'pattern and practice' of wage abuse, including overtime violations"); *Patel v. Nike Retail Servs., Inc.*, 58 F. Supp. 3d 1032, 1042 (N.D. Cal. 2014) (holding Defendant's assumption that Plaintiff was owed one hour of overtime compensation per week based on the complaint's allegation that overtime violations occurred "regularly" was "very reasonable").

Given Plaintiff alleges a "pattern and practice" of wage abuse, including overtime violations, and that this violation rate has been approved by other courts, this Court finds Defendants' assumption of one hour of uncompensated overtime per workweek reasonable on its face.  Therefore, Defendants have properly calculated the amount in controversy on this claim as $1,786,138.68.[6]

### 2.  Rest Breaks

Defendants' rest break calculation is also reasonable and supported by evidence.  In their Opposition, Defendants assume a 100% violation rate based on

---

[6] Further, Defendants excluded entirely from their calculation any potential damages stemming from Plaintiff's allegation that Defendants "failed to use the shift differential pay/commissions/non-discretionary bonuses/non-discretionary performance pay to calculate the regular rate of pay used to calculate the overtime rate for the payment of overtime wages" where applicable.  (FAC ¶ 38; Opp'n at 13 n.9).  Consideration of potential liability flowing from this claim would have produced an even higher calculation of overtime damages.

their understanding that Plaintiff alleges rest break violations were produced by a "uniform practice applicable to all employees and shifts." (Opp'n at 9.) In the alternative, in their initial Notice of Removal, Defendants assume two rest period violations per class member per workweek. (Not. ¶ 30.)

The assumed violation rate in the Defendants' Opposition likely misinterprets the extent of Plaintiff's allegations. California law generally requires employers to provide employees a meal break of at least thirty minutes for each work period of more than five hours per day. Lab. Code § 512(a). Defendants argue Plaintiff's theory of rest break liability supports a 100% violation rate because Plaintiff "alleges a uniform practice applicable to all employees and shifts" requiring "employees to remain on the premises during rest breaks." (Opp'n at 9.) However, the precise language of the FAC alleges "Defendants' common and uniform policies and practices have unlawfully denied Plaintiff . . . rest period premiums for all rest periods that were not provided in compliance with the applicable IWC Order and California Labor Code." (FAC ¶ 18.) "Defendants required Plaintiff and the other class members to remain on Defendants' premises during purported rest periods, thereby failing to relieve them of all employer control," (FAC ¶ 43), and that "rest periods were missed, shortened, late, and/or interrupted because Defendants required them to perform work duties." (FAC ¶ 95.) The fact that Defendants allegedly had a uniform policy of not paying rest break premiums does not mean that employees were denied rest breaks each shift but rather that, when employees did miss rest breaks, they were not properly compensated. Further, though Defendants are correct about the nature of Plaintiff's theory of rest break liability, they mischaracterize Plaintiff's allegations of its extent; the FAC merely states that putative class members were required to remain on the premises without any allegation about the frequency with which they were required to do so.

However, this Court declines to decide if an assumed violation rate of 100% is reasonable here as Defendants can establish that the amount in controversy exceeds

$5 million even based on the more conservative assumption of 2 missed rest breaks per workweek contained in their Notice of Removal.  (*See* Not. ¶ 30.)  As described above, the FAC alleges that a "uniform" policy denied putative class members rest period premiums for all missed rest periods but contains no allegations concerning the frequency with which employees missed such breaks.  District courts in the Ninth Circuit presented with similarly imprecise allegations about the frequency of missed rest breaks have deemed the assumption of two rest break violations per week reasonable.  *See, e.g.*, *Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (holding assumption that employees missed three out of ten eligible rest periods each week reasonable where complaint "offered no guidance as to the frequency of the alleged violations, only that Defendant had a 'policy and practice' of meal and rest period violations"); *Stanley v. Distribution Alternatives, Inc.*, No. 5:17-cv-02173-AG-KK, 2017 WL 6209822, at *2 (C.D. Cal. Dec. 7, 2017) (holding three missed rest breaks per week was a reasonable assumption to draw from a complaint that alleged a "pattern and practice" of wage and hour violations but "offer[ed] no guidance as to the frequency of these violations").

Further, Defendants have bolstered the reasonableness of this assumption with evidence.  Plaintiff's Motion objects to Defendants' assumption of two rest break violations per week by arguing Defendants "fail to even lay foundation that all of the shifts the class members worked were of sufficient length to mandate the provision of meal and rest periods."  (Mot. at 9.)  However, in support of Defendants' Opposition, the Munhall Declaration establishes that approximately 96.3% of shifts were of a length eligible for a rest break.[7]  (Munhall Decl. ¶ 7.)  Based on the high percentage of shifts eligible for a rest break and Plaintiff's allegations of both the numerous ways in which employees were deprived of complete rest breaks and a uniform policy

---

[7] Specifically, the Munhall Declaration attests that "[o]ut of 224,847 total shifts worked, 216,554 were more than three and a half hours in length, and 206,730 were over five hours in length."  (Munhall Decl. ¶ 7.)

denying employees premium pay when rest breaks were missed, the Court finds Defendants' assumption of two rest break violations per week reasonable.

This claim therefore adds $1,049,420.68 to the amount in controversy.  To reach this figure, the Court utilized Defendants' violation rate from the Notice of Removal in the calculation supplied in the Opposition.  This calculation allows the Court to use the more precise figure of rest-break eligible shifts rather than multiplying by the total number of workweeks as Defendants initially did in their Notice of Removal.  (*See* Not. ¶ 30.)  Based on this calculation, the amount in controversy for this claim is $1,049,420.68 ($24.23 [average hourly rate] x 216,554 [rest-break eligible shifts] x 0.20 [20% violation rate[8]]).

### 3.  Meal Breaks

As with the allegations of missed rest breaks, Plaintiff's allegations of missed meal breaks lack any specificity about the frequency of such occurrences.  According the FAC, "Plaintiff and the other class members' meal periods were missed, shortened, late, and/or were interrupted because of chronic understaffing and Defendants required them to perform work duties such as attending to tasks that were required to be completed in order to meet productivity quotas set by Defendants."  (FAC ¶ 81.)  Although these allegations do not identify the frequency of missed meal breaks, the FAC does allege that "Defendants' common and uniform policies and practices have unlawfully denied Plaintiff and the other class members meal period premiums for all meal periods that were not provided."  (FAC ¶ 18.)

Based on these allegations, this Court finds Defendants' assumption of two meal period violations per workweek to be reasonable.  (*See* Opp'n at 11.)  Several district courts have found such a violation rate a reasonable assumption to draw from a complaint that alleges a "pattern and practice" of meal break violations without

[8] Defendants' evidence that the average shift length was 8.06 hours indicates that employees would have been eligible for an approximate total of 10 rest breaks per week.  The assumption that putative class members missed 2 rest breaks per week thus translates to a violation rate of 20%.

providing any further information about the frequency of missed breaks. *See, e.g.*, *Sanchez v. Abbott Lab'ys*, No. 2:20-cv-01436-TLN-AC, 2021 WL 2679057, at *4–5 (E.D. Cal. June 30, 2021) (deeming the assumption of three non-compliant meal breaks per week reasonable when the complaint alleged a "'pattern and practice' of meal period violations"); *Bryant*, 284 F. Supp. 3d at 1151 (holding assumption that employees missed three out of five eligible meal periods each week reasonable where complaint "offered no guidance as to the frequency of the alleged violations, only that defendant had 'a policy and practice' of meal and rest period violations"); *Stanley*, 2017 WL 6209822, at *2 (holding three missed meal breaks per week was a reasonable assumption to draw from a complaint that alleged a "pattern and practice" of wage and hour violations but "offer[ed] no guidance as to the frequency of these violations").

Again, Defendants have also provided evidence supporting the reasonableness of this assumption. The Munhall Declaration establishes that approximately 91.9% of shifts were of a length eligible for a meal break.[9] Based on the high percentage of shifts eligible for a meal break and Plaintiff's allegation of a uniform policy denying employees premium pay when meal breaks were missed, the Court finds Defendants' assumption of two meal break violations per week reasonable. This claim adds $2,003,627.16 to the amount in controversy.

### 4. Waiting Time Penalties

Defendants' calculation of penalties for their alleged failure to timely pay wages to discharged or quitting employees under Labor Code section 203 (known as "waiting time penalties") is similarly reasonable and supported by competent proof. The Complaint does not specify the rate of violations, and Defendants assumed a violation rate of 100% for the waiting time penalties. (Opp'n at 14.)

---

[9] The Munhall Declaration attests that "[o]ut of 224,847 total shifts worked, 216,554 were more than three and a half hours in length, and 206,730 were over five hours in length." (Munhall Decl. ¶ 7.)

The recovery of waiting time penalties does not hinge on the number of violations committed.  Rather, Defendants "need only have caused and failed to remedy a single violation per employee for waiting time penalties to apply."  *Noriesta v. Konica Minolta Bus. Solutions U.S.A.*, No. 5:19-cv-00839-DOC-SP, 2019 WL 7987117, at *6 (C.D. Cal. June 21, 2019); *see also* Cal. Lab. Code § 203(a).

Based on Defendants' assumptions regarding overtime and meal and rest break violations, which the Court has found to be reasonable, it is also reasonable to assume all or nearly all employees in the class would be entitled to recovery of waiting time penalties.  *See Cavada v. Inter-Continental Hotels Grp.*, No. 3:19-cv-01675-GPC-AHG, 2019 WL 5677846, at *9 (S.D. Cal. Nov. 1, 2019) ("Because the waiting time penalties are also based on the one missed meal and one missed rest breaks, a 100% violation rate . . . is based on a reasonable assumption"); *Noriesta*, 2019 WL 7987117, at *6 (holding that if "Defendant had a 'pattern and practice' of refusing to grant meal and rest breaks or pay class members for all hours worked, then it is likely that all or nearly all class members experienced [waiting time] violations").

Defendants' assumption of a 100% violation rate is also supported by evidence as the Munhall declaration establishes that a high percentage of shifts that were break-eligible.  (Munhall Decl. ¶ 7.)  Therefore, Defendants' assumption that all employees whose employment ended during the relevant period worked meal break-eligible shifts and are thus entitled to waiting time penalties has evidentiary support.  This claim therefore adds $1,814,342.40 to the amount in controversy.

### 5.  Wage Statements

The assumptions underlying Defendants' wage statement calculations are reasonable and supported by the evidence presented.  Defendants assumed a violation rate of 100% because "Plaintiff alleges multiple theories of liability that, if true, each independently make every wage statement inaccurate."  (Opp'n at 15.)

Claims for inaccurate wage statements are derivative of claims for other wage and hour violations as those violations typically render wage statements inaccurate.

15

*Sanchez*, 2021 WL 2679057, at *6; *Cavada*, 2019 WL 5677846, at *8.  Therefore, "when meal period and rest period violation rates are found reasonable, courts have held a 100% wage statement inaccuracy assumption may also be reasonable." *Cunningham v. Sharecare CL, LLC*, No. 2:23-cv-02564-DJC-CSK, 2024 WL 3738688, at *5 (E.D. Cal. Aug. 9, 2024) (quoting *Sanchez*, 2021 WL 2679057, at *6).

Here, as Defendants' assumed violation rates for overtime, meal periods, and rest periods are reasonable and supported by evidence, the Court finds reasonable the assumption that 100% of wage statements contained inaccuracies.  *See Cunningham*, 2024 WL 3738688, at *5 (holding 100% violation rate reasonable because meal and rest period assumed violation rates found reasonable); *Sanchez*, 2021 WL 2679057, at *6 (holding 100% violation rate reasonable based on finding reasonable assumed violation rates for meal and rest periods and overtime); *Cavada*, 2019 WL 5677846, at *8 (finding reasonable 100% violation rate "since one missed meal and rest period was reasonable, that would mean that every wage statement was inaccurate and subject to the penalties"); *Nunes v. Home Depot U.S.A., Inc.*, No. 2:19-cv-01207-JAM-DB, 2019 WL 4316903, at *3 (E.D. Cal. Sept. 12, 2019) (holding "assumption of a 100 percent violation rate is reasonable" in calculating wage statement violation penalties because "it is reasonable to assume the class members suffered at least one violation (e.g. one missed meal or rest break) per pay period").  Accordingly, this claim adds $998,800 to the amount in controversy.

### 6. Attorneys' Fees

Finally, Defendants' attorneys' fees calculations are also reasonable.  Attorneys' fees are included in the amount-in-controversy determination where the underlying statutes authorize an award of attorneys' fees.  *Arias*, 936 F.3d at 927; *Fritsch v. Swift Transp. Co. of Ariz.*, 899 F.3d 785, 794 (9th Cir. 2018).  As Plaintiff correctly highlights, "attorneys' fees shifting provisions in California Labor Code §§ 218.5 and 1194 do not apply to legal work relating to meal and rest period claims." *Id.* at 796 (citing *Kirby v. Immoos Fire Prot., Inc.*, 53 Cal. 4th 1244, 1255 (2012)).  Accordingly, the Court should

16

not assess the value of attorneys' fees on the labor code violations.  However, Plaintiff also brings a derivative UCL claim (see FAC ¶ 132) and would be entitled to attorneys' fees on that claim pursuant to Cal. Code Civ. Proc. § 1021.5.  *See Barrett v. Armadillo Holdings, LLC*, No. 1:22-cv-00882-DJC-DB, 2024 WL 1133419, at *8 (E.D. Cal. Mar. 15, 2024); *see also* Cal. Code Civ. Proc. § 1021.5 (providing that "a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest" if certain conditions are met).  Therefore, the Court may consider both the attorneys' fees derived from Plaintiff's meal and rest break claims as well as the overtime claim.

Defendants' assumption that attorneys' fees would constitute 25% of the damages calculated above is reasonable.  (*See* Opp'n at 17.)  The benchmark for class action attorneys' fees in the Ninth Circuit is 25%, with 20–30% within the usual range. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *see also Garibay v. Archstone Communities LLC*, 539 F. App'x 763, 764 (9th Cir. 2013) (explaining that defendant "correctly notes that 25% recovery is the 'benchmark' level for reasonable attorney's fees in class action cases and that such fees are properly included in calculations of the amount in controversy" (internal citations omitted)).[10]  Defendants also provided 2 judgments approving settlements that awarded 35% and 25% attorneys' fees to Plaintiff's counsel in similar class action cases, both of which also alleged meal and rest break violations.  (Opp'n, Exhs. A & B (ECF No. 22-2).) Therefore, it is reasonable to assume attorneys' fees of 25% or $1,913,082.23

---

[10] Other district courts have rejected this approach in favor of the lodestar method to more closely mirror the way in which attorneys' fees would be calculated under the applicable fee shifting statute. *See, e.g.*, *Lopez v. Advanced Drainage Sys., Inc.*, 777 F. Supp. 3d 1100, 1109 (N.D. Cal. 2025); *Gurzenski v. Delta Air Lines, Inc.*, No. 2:21-cv-05959-AB-JEM, 2021 WL 5299240, at *5 (C.D. Cal. Nov. 12, 2021). Although the Court notes that the lodestar method can result in a lower attorneys' fee award than the benchmark method would in similar cases, given Defendants reach the requisite amount in controversy before the addition of attorneys' fees, the method of calculation will not change the outcome in this case.

($7,652,328.92 [total of claims included in amount in controversy in previous sections] x 0.25 [25% benchmark for attorneys' fees]).

* * *

The total amount in controversy on these claims is $9,565,411.15 ($1,786,138.68 [overtime] + $1,049,420.68 [rest breaks] + $2,003,627.16 [meal breaks]; $1,814,342.40 [waiting time penalties]; $998,800 [wage statements] + $1,913,082.23 [attorneys' fees]).  As this amount exceeds the jurisdictional threshold, the Court has diversity jurisdiction over this case.

### CONCLUSION

This amount exceeds the requisite amount even without consideration of potential liability flowing from Plaintiff's claims concerning unreimbursed business expenses and unpaid minimum wages as well as the use of fee shift differentials in calculations of the rate of premium pay.  Therefore, this Court holds Defendant has established by a preponderance of the evidence that CAFA's amount-in-controversy requirement is satisfied.

For the reasons stated above, it is ORDERED that Plaintiff's Motion to Remand (ECF No. 21) is DENIED.

IT IS SO ORDERED.

Dated:    **January 26, 2026**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC7 – seijas24cv03423.mtr

18